# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-70015

United States Court of Appeals
Fifth Circuit

**FILED**
June 13, 2019

Lyle W. Cayce
Clerk

DEMETRIUS DEWAYNE SMITH,

Petitioner–Appellee, Cross-Appellant,

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellant, Cross-Appellee.

Appeals from the United States District Court
for the Southern District of Texas

Before CLEMENT, OWEN, and HAYNES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Demetrius Dewayne Smith was convicted of capital murder in Texas state court and sentenced to death. The state court's judgment was affirmed on direct appeal, and Smith's state habeas petition was denied. In this federal habeas proceeding, the federal district court held that the Texas Court of Criminal Appeals' application of *Witherspoon v. Illinois*[1] and its progeny was unreasonable because, the district court concluded, the state trial court violated Smith's constitutional right to an impartial jury under the Eighth and

---

[1] 391 U.S. 510 (1968).

No. 18-70015

Fourteenth Amendments when it excluded a member of the venire for having moral, conscientious, or religious objections to the death penalty.  Respondent Lorie Davis (to whom we will refer as the State) appeals.  We reverse the district court's judgment to the extent that it conditionally grants habeas relief, and we otherwise affirm the district court's judgment.

## I

Smith was convicted by a jury in June 2006 of a capital offense for the murders of Tammie White, who was the mother of three, and her eleven-year-old daughter, Kristina White.[2]  The facts regarding these brutal killings are set forth briefly in the opinion of the Texas Court of Criminal Appeals (TCCA) on direct appeal,[3] and we will not recount them here.

Based upon the jury's answers to the special issues submitted in the punishment phase, the trial court sentenced Smith to death.[4]  Appeal to the TCCA was automatic,[5] and Smith presented numerous points of error.[6]  The TCCA affirmed Smith's conviction and sentence.[7]  The United States Supreme Court denied certiorari.[8]

Smith then filed an application for a writ of habeas corpus in Texas state court.[9]  He presented nine grounds for relief.[10]  After conducting an evidentiary hearing, the state trial court adopted the State's proposed findings of fact.[11]

---

[2] *Smith v. State*, 297 S.W.3d 260, 264-65 (Tex. Crim. App. 2009).

[3] *Id.* at 265.

[4] *Id.* at 264; ROA.7455-56.

[5] TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(h) (West Supp. 2018).

[6] *Smith*, 297 S.W.3d at 264.

[7] *Id.* at 278.

[8] *Smith v. Texas*, 559 U.S. 975 (2010).

[9] ROA.5507.

[10] ROA.5511-13.

[11] ROA.7482-83, 7455.

No. 18-70015

The TCCA adopted the trial court's findings of fact and all but one of its conclusions of law and denied relief.[12]

In his habeas petition in federal court, Smith set forth five claims for relief: (1) he was denied an impartial jury when the trial court dismissed potential jurors Patricia Cruz and Matthew Stringer on the basis that they had moral, conscientious, or religious objections to the death penalty,[13] (2) the State's use of disciplinary records from his previous incarcerations violated the Confrontation Clause of the Sixth Amendment,[14] (3) his trial counsel provided ineffective assistance by failing to investigate mitigating evidence,[15] (4) trial counsel was ineffective because he failed to bring evidence to the court's attention that would have raised a doubt as to Smith's competency to stand trial,[16] and (5) under evolving standards of decency, executing the severely mentally ill violates the Eighth Amendment.[17]

The federal district court conditionally granted relief based on Smith's first claim and ordered the State to release him unless it either convenes a new sentencing hearing or imposes a sentence other than death.[18] The court denied relief on all other grounds and did not issue a certificate of appealability (COA).[19]

The State appeals, arguing that the district court did not accord the deference due to the TCCA's decision under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) regarding the dismissal of jurors for cause. Smith counters that the district court's ruling regarding the removal of

---

[12] ROA.5719.
[13] ROA.143, 163-77.
[14] ROA.143-44, 177-84.
[15] ROA.144, 184-209.
[16] ROA.145, 209-12.
[17] ROA.145, 212-53.
[18] ROA.461.
[19] ROA.461.

No. 18-70015

Matthew Stringer from the venire was correct. Alternatively, Smith urges us to affirm the district court's judgment on other grounds: (1) trial counsel provided ineffective assistance by failing to conduct a reasonable sentencing investigation, and (2) the Eighth and Fourteenth Amendments prohibit the execution of the severely mentally ill. Smith initially urged an additional ground for affirmance, which was that potential juror Patricia Cruz was improperly excluded, but he abandoned that claim at oral argument. We may affirm a district court's judgment on any ground supported by the record, even though Smith has not obtained a COA.[20]

## II

At oral argument, Smith for the first time asserted that this court lacks subject matter jurisdiction. Smith contends that 28 U.S.C. § 2253 requires the party seeking relief to obtain a COA before this court has subject matter jurisdiction over an appeal. Under § 2253(c)(1), "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding" in which the prisoner is in state custody.[21] Federal Rule of Appellate Procedure 22(b)(3) provides that a COA is not required when a state or its representative appeals.[22] The Supreme Court held in *Gonzalez v. Thaler* that a COA is a jurisdictional prerequisite to our review.[23] Smith argues that Rule 22 impermissibly exempts the State from seeking a COA to obtain relief, contrary to the plain text of § 2253.

The Supreme Court indicated in *Jennings v. Stephens* that the State is not required to obtain a COA in order to pursue an appeal after a federal

---

[20] *See Jennings v. Stephens*, 135 S. Ct. 793, 802 (2015).
[21] 28 U.S.C. § 2253(c)(1)(A).
[22] FED. R. APP. P. 22(b)(3).
[23] 565 U.S. 134, 142 (2012).

4

district court has granted habeas relief. The Supreme Court reasoned that "[s]ection 2253(c) . . . provides that 'an appeal may not be taken to the court of appeals' without a certificate of appealability, which itself requires 'a substantial showing of the denial of a constitutional right.'"[24] The Court then explained that "[s]ection 2253(c) performs an important gate-keeping function, but once a State has properly noticed an appeal of the grant of habeas relief, the court of appeals must hear the case, and 'there are no remaining gates to be guarded.'"[25]

In *Jennings*, a Texas inmate had obtained habeas relief in federal district court, and the State of Texas appealed to the Fifth Circuit.[26] The inmate asked this court to affirm on grounds that had been rejected by the federal district court, and we held that we lacked jurisdiction over the rejected theory because the inmate failed to cross-appeal and failed to obtain a COA.[27] The Supreme Court reversed and remanded for consideration of the alternate ground asserted as a basis for upholding the district court's judgment.[28] Therefore, the issue that the Supreme Court decided was whether a state prisoner "was permitted to pursue the theory that the District Court had rejected without taking a cross-appeal or obtaining a certificate of appealability."[29] Neither party challenged this court's jurisdiction to hear the state's appeal. However, like all courts, the Supreme Court must *sua sponte* consider its subject matter jurisdiction.[30] The Supreme Court's statement regarding the Fifth Circuit's

---

[24] *Jennings*, 135 S. Ct. at 802 (quoting 28 U.S.C. § 2253(c)).

[25] *Id*. (quoting *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002)).

[26] *Id*. at 798.

[27] *Id*.

[28] *Id*. at 802.

[29] *Id*. at 796.

[30] *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (citing *United States v. Cotton*, 535 U.S. 625, 630 (2002)) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.").

No. 18-70015

jurisdiction to hear the state's appeal cannot be considered *obiter dictum*. If the Fifth Circuit had not had jurisdiction over the state's appeal, then its judgment should and would have been vacated on that basis, the Supreme Court would not have remanded the case to the Fifth Circuit for further proceedings, and the Supreme Court would not have reached the question of whether the inmate could assert claims rejected by the federal district court as an alternative basis for affirming the district court's judgment granting habeas relief.

Even if the discussion in *Jennings* were *dicta*, Smith's argument not only implicitly asserts that the Supreme Court has failed to recognize a jurisdictional issue for more than twenty-three years, his argument is inconsistent with the text of § 2253 for the reasons that the Court explained in *Jennings*. Section 2253(c), read in its entirety and in context, reflects that the COA requirements are intended to apply only to appeals by state or federal prisoners and that they were not intended to apply to appeals by states or the United States in habeas proceedings. Section 2253(c) applies to state inmates as well as those confined in federal penal institutions,[31] and subsections 2253(c)(2) and (3) provide:

> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).[32]

The United States government, acting in its capacity to enforce federal criminal laws, does not have "constitutional rights." It would be non-sensical to require a "substantial showing of the denial of a constitutional right" as a

---

[31] *See* 28 U.S.C. § 2253(c)(1).
[32] *Id.* § 2253(c).

6

prerequisite to an appeal by the United States in a habeas proceeding. If Congress had intended to foreclose the right of the United States or the States to appeal in habeas proceedings, it would have done so in a forthright manner. "Congress, [the Supreme Court has] held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[33]

This circuit and our sister circuits are, as noted above, required to examine our jurisdiction *sua sponte*. No circuit court has held that it lacks jurisdiction in an appeal from a district court's grant of habeas relief if the state or federal government, as the case may be, failed to obtain a COA. Our court and others have applied Rule 22(b)(3) in habeas proceedings.[34] In the present case, a COA was not required for the State to appeal.[35]

## III

When a state court has adjudicated a claim on the merits, AEDPA provides that federal courts cannot grant habeas relief unless the state court proceedings resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[36] The TCCA resolved the merits of each of Smith's claims presently before our court.

---

[33] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

[34] *See Malchi v. Thaler*, 211 F.3d 953, 956 (5th Cir. 2000) (citing FED. R. APP. P. 22(b)(3)) ("A certificate of appealability is not required because a representative of the state is appealing the district court's grant of habeas relief."); *see also Sutton v. Pfister*, 834 F.3d 816, 819-20 (7th Cir. 2016); *Jones v. Stephens*, 541 F. App'x 399, 404 (5th Cir. 2013) (per curiam); *Wilson v. Beard*, 589 F.3d 651, 657 (3d Cir. 2009); *Lurie v. Wittner*, 228 F.3d 113, 121 (2d Cir. 2000).

[35] *See* FED. R. APP. P. 22(b)(3).

[36] 28 U.S.C. § 2254(d).

No. 18-70015

"Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims.'"[37]  With regard to Matthew Stringer's dismissal as a potential juror, "[t]his is a straightforward inquiry" because the TCCA on direct appeal was "the last state court to decide [this] federal claim" and it "explain[ed] its decision on the merits in a reasoned opinion."[38]

Smith's claims that his state court trial counsel was ineffective and that it would violate the Eighth Amendment to execute a person who is mentally ill were decided in the state habeas proceedings.[39]  The TCCA expressly adopted all of the state habeas trial court's recommended findings and conclusions relevant to those issues.[40]  Accordingly, we will consider the state habeas trial court's findings and conclusions to be those of the TCCA.

## IV

In Smith's direct appeal to the TCCA, he argued that the state trial court violated the Sixth and Fourteenth Amendments when it excused ten potential jurors for cause.[41]  The state trial court determined that these members of the venire were substantially impaired because of beliefs or feelings about, or objections to, the death penalty.[42]  The TCCA's opinion discussed the pertinent

---

[37] *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (quoting 28 U.S.C. §2254(d) and *Hittson v. Chatman*, 135 S. Ct. 2126, 2126 (GINSBURG, J., concurring in denial of certiorari)).

[38] *Id.* at 1192; *see Smith v. State*, 297 S.W.3d 260, 274 (Tex. Crim. App. 2009) (rejecting this claim on its merits); ROA.5511-13 (not bringing this claim in the state habeas application).

[39] ROA.7476, 7478.

[40] ROA.5719.

[41] *Smith*, 297 S.W.3d at 267-68.

[42] *See id.* at 268-74.

No. 18-70015

Supreme Court decisions, citing *Witherspoon v. Illinois*,[43] *Adams v. Texas*,[44] and *Wainwright v. Witt*,[45] and then considered the evidence in the record regarding each person excluded from the venire.[46] As noted, only the TCCA's decision as to Matthew Stringer remains at issue in our court. If even a single potential juror is impermissibly excluded, "any subsequently imposed death penalty cannot stand."[47]

The federal district court conditionally granted habeas relief based on Stringer's exclusion.[48] The district court reasoned that Stringer had been removed from the venire "'because [he] voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction' . . . without any basis for determining that he would be substantially impaired in his ability to follow the law."[49]

It is unclear from the Supreme Court's decisions whether removal of a potential juror based on his or her views about the death penalty is to be reviewed as a factual determination, a legal issue, or a mixed question of law and fact. In its pre-AEDPA decision in *Wainwright v. Witt*, the Supreme Court held that the Eleventh Circuit had erroneously concluded that the issue is a mixed question of law and fact.[50] In *Witt*, the state trial court excluded a potential juror; the Florida Supreme Court affirmed on direct appeal, rejecting the *Witherspoon* claim; the Supreme Court denied certiorari; state

---

[43] 391 U.S. 510 (1968).

[44] 448 U.S. 38 (1980).

[45] 469 U.S. 412, 429 (1985).

[46] *Smith*, 297 S.W.3d at 268-74.

[47] *Davis v. Georgia*, 429 U.S. 122, 123 (1976); *see also Gray v. Mississippi*, 481 U.S. 648, 666 (1987) (discussing *Davis v. Georgia* and reversing a Mississippi sentence of death because a single juror was improperly excluded).

[48] ROA.461.

[49] ROA.447-48 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968)).

[50] 469 U.S. at 427-29.

postconviction review was unsuccessful; the federal district court denied habeas relief; but the Eleventh Circuit granted the writ of habeas corpus based on the *Witherspoon* claim.[51]  The Supreme Court reversed.[52]  Writing for the Court, Justice Rehnquist reasoned that "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record."[53]  The Supreme Court therefore held that "[t]hese are the 'factual issues' that are subject to § 2254(d)."[54]

The text of 28 U.S.C. § 2254(d) as it existed when *Witt* was written is quoted in footnote seven of *Witt*,[55] and we will not reproduce it here.  But § 2254(d) provided that in any federal habeas proceeding considering a state court decision on the merits, "a determination . . . of a factual issue . . . shall be presumed to be correct."[56]  The Supreme Court held in *Witt* that the presumption of correctness, as explicated in *Patton v. Yount*,[57] "applies equally well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause."[58]  Subsequently, in *Darden v. Wainwright*, in holding that a juror was properly excluded in a death penalty case, the Court reiterated that "*Witt* . . . made clear that the trial judge's determination that a potential juror is impermissibly biased is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254."[59]  It would seem from

---

[51] *Id.* at 415 (citations omitted).

[52] *Id.* at 435.

[53] *Id.* at 429.

[54] *Id.*

[55] *Id.* at 426 n.7.

[56] *Id.*; *see also id.* at 426.

[57] 467 U.S. 1025 (1984).

[58] *Witt*, 469 U.S. at 429.

[59] 477 U.S. 168, 175 (1986).

these pre-AEDPA precedents that a state court's determination that a potential juror in a capital case is substantially impaired is a factual finding. However, subsequent decisions counsel that we should assess such a determination under both subsection (1), the "contrary to" or "unreasonable application of, clearly established Federal law" prong, and subsection (2), the "unreasonable determination of the facts in light of the evidence" prong, of § 2254(d).

Passages in the Supreme Court's decision in *Uttecht v. Brown*, which was governed by AEDPA,[60] continued to indicate that whether a state court's exclusion of a potential juror for cause was permissible is a factual issue.[61] However, in observing that AEDPA provided "additional" "directions to accord deference" that are "independent,"[62] the Court cited *both* subsections (1) and

---

[60] 551 U.S. 1, 35-36 (2007) (STEVENS, J., dissenting) ("[T]his case comes to us under the standard of review imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).").

[61] *See, e.g.*, *id.* at 7 ("Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias."); *id.* ("The judgment as to 'whether a venireman is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less.'" (alteration in original) (quoting *Witt*, 469 U.S. at 429)); *id.* at 8 ("Even when '[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty,' the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." (alterations in original) (quoting *Darden*, 477 U.S. at 178)); *id.* at 9 ("[I]n determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." (citing *Witt*, 469 U.S. at 424-34)); *id.* ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (citing *Witt*, 469 U.S. at 428)).

[62] *Id.* at 10 ("The requirements of the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, of course, provide additional, and binding, directions to accord deference. The provisions of that statute create an independent, high standard to be met

11

(2) of § 2254(d). Nevertheless, the Court ultimately concluded in a single sentence that "[the Supreme Court of Washington's] decision, like the trial court's, was not contrary to, or an unreasonable application of, clearly established federal law."[63] The Court did not expressly make a determination under § 2254(d)(2).

More recently, in *White v. Wheeler*, the Supreme Court concluded that "[t]he Court of Appeals was required to apply" § 2254(d)(1)'s "'contrary to, or . . . unreasonable application of, clearly established Federal law'" "deferential standard to the state court's analysis of [a] juror exclusion claim" in a death penalty case.[64] Citing *Witt* as the clearly established federal law,[65] the Court applied § 2254(d)(1)'s standard to both the state trial court's decision to exclude a potential juror and the Kentucky Supreme Court's decision that the trial court did not err.[66]

We conclude from these decisions that the prudent course is to apply AEDPA's presumption under § 2254(e)(1) that "a determination of a factual issue made by a State court" is "correct" and to apply both of § 2254(d)'s standards. The substance of the clearly established federal law, including the deference that is to be accorded a trial court's determination that a potential juror is substantially impaired, is set forth in *Witherspoon*, as modified by *Witt* and its progeny.

---

before a federal court may issue a writ of habeas corpus to set aside state-court rulings. *See* 28 U.S.C. §§ 2254(d)(1)-(2) . . . .").

[63] *Id.* at 20.

[64] 136 S. Ct. 456, 460 (2015) (quoting 28 U.S.C. § 2254(d)(1)).

[65] *Id.* (citing *Witt*, 469 U.S. at 425-26).

[66] *Id.* at 461 ("The trial judge's decision to excuse Juror 638 did not violate clearly established federal law by concluding that Juror 638 was not qualified to serve as a member of this capital jury."); *id.* ("[T]he Kentucky Supreme Court's ruling that there was no error is not beyond any possibility for fairminded disagreement."); *id.* at 462 ("The Kentucky Supreme Court was not unreasonable in its application of clearly established federal law when it concluded that the exclusion of Juror 638 did not violate the Sixth Amendment.").

No. 18-70015

**A**

The voir dire in Smith's trial spanned several weeks. The venire consisted of four panels of more than seventy potential jurors each that were summoned and questioned at different times.[67] Potential jurors on each panel were first directed to complete a questionnaire.[68] The state trial court then conducted a general voir dire before individually questioning jurors.[69] The general voir dire of the first panel summoned began on May 8, 2006.[70]

Stringer, whose exclusion is at issue, was first summoned on Wednesday, May 17, 2006.[71] The questionnaire that he was given contained instructions from the state trial court, which explained that "[y]our oath requires that you truthfully answer the questions."[72] He averred in signing his questionnaire that his answers were given under oath.[73]

Stringer's answers revealed that he was 25 years old.[74] He checked "No" in response to "Have you ever been opposed to the death penalty?"[75] He checked "Yes" in response to "Should people ACCUSED of murder be treated differently than people accused of committing other crimes?"[76] When prompted to "please explain" his response to that question, he wrote, "Thats [sic] one of the most hanest [sic] crimes."[77] In response to "What are your feelings about the death penalty? Please explain," Stringer wrote, "Its [sic]

---

[67] ROA.2211 (first panel); ROA.2656 (second panel) ROA.3184 (third panel); ROA.3542 (fourth panel).

[68] *See, e.g.*, ROA.2211.

[69] *See, e.g.*, ROA.2213-52, 2256-72.

[70] ROA.2210.

[71] ROA.3583.

[72] ROA.8136.

[73] ROA.8151.

[74] ROA.8137.

[75] ROA.8145.

[76] ROA.8147.

[77] ROA.8147.

good that we have it and should be used on the worst of crimes."[78]  When asked "Do you think the death penalty in Texas is used too often or too seldom? Why?" Stringer wrote, "I'm sure it is being used often enough."[79]  Stringer was instructed to check one of five options "which 'best' summarizes your general views about capital punishment (the death penalty)" ranging from "I am opposed to capital punishment under any circumstances" to "I am strongly in favor of capital punishment as an appropriate penalty."[80]  He checked the middle option, which was "I am neither generally opposed nor generally in favor of capital punishment."[81]  He was then asked to check one of five options after being instructed to "[a]ssume you are on a jury to determine the sentence for a defendant who has already been convicted of a capital murder.  If the law gives you a choice of death or life imprisonment: (check only one)."[82]  The five options ranged from "I could not vote for the death penalty regardless of the facts and circumstances of the case" to "I would always vote for the death penalty in a case where the law allows me to do so."[83]  He chose the middle option, which was "I would consider all of the penalties provided by law and the facts and circumstances of the particular case."[84]  Stringer was given a list of statements and asked to check "AGREE" or "DISAGREE" next to each.[85]  He agreed that "[l]ife imprisonment is more effective than capital punishment," "[c]apital punishment is just and necessary," "[i]t doesn't make any difference to me whether we have capital punishment or not," "[c]apital punishment

---

[78] ROA.8148.
[79] ROA.8148.
[80] ROA.8149.
[81] ROA.8149.
[82] ROA.8149.
[83] ROA.8149.
[84] ROA.8149.
[85] ROA.8150.

should be used more often than it is," "[p]rison makes convicted people worse," and "[p]rison rehabilitates people convicted of crimes."[86]    He checked "DISAGREE" next to these statements: "[e]xecution of criminals is a disgrace to civilized society," "I do not believe in capital punishment, but it is not practically advisable to abolish it," "[c]apital punishment is the most hideous practice of our time," "[c]apital punishment gives the criminal what he deserves," "[t]he state cannot teach the sacredness of human life by destroying it," and "[c]apital punishment is justified only for pre-meditated murder."[87] Stringer checked "No" in response to "Do you want to be a juror in this case?" and in response to "Why or why not?" he wrote, "If this is a murder trial, I couldn't cause [sic] the talk of death an [sic] any way make [sic] me uncomfortable."[88]

Stringer attended a general voir dire on Thursday, May 18, 2006,[89] the day after he had first been summoned and filled out the questionnaire.[90]  At the outset, the court told the venire that some of them would be excused based on their answers to the questionnaire, and the court then called out the names and prospective juror numbers of those who were excused.[91]  The state trial court explained to the remaining members of the venire what Smith's trial rights were and then turned to the capital sentencing process.[92]  The court told these prospective jurors that, if the jury convicted Smith, there would be a second phase of the trial in which the jury would determine whether Smith

---

[86] ROA.8150.
[87] ROA.8150.
[88] ROA.8150.
[89] ROA.3542, 3797.
[90] ROA.3583.
[91] ROA.3544-46.
[92] *See* ROA.3550-83.

would receive a life sentence or a death sentence.[93]  The judge explained that the jury would have to answer two special issues, and the answer to those issues would determine the sentence the judge imposed.[94]  The court told the prospective jurors that the first question was "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?"[95]  The court gave a lengthy explanation of the elements of this issue, emphasizing more than once that a "no" answer meant that the defendant would serve forty years in prison before being considered for parole, but a "yes" answer to this question could mean a sentence of death.[96]  The state court then told the venire what the second issue would be, in phrases because of the length of the question, explaining each phrase in detail and advising that a "no" answer would mean that the defendant would receive the death penalty.[97]

The state trial court then explained that the purpose of voir dire was "to make sure that all jurors can keep an open mind; that they can follow the law that [the court] give[s]; that they can apply the facts to the circumstances that they hear to the law that [the court] give[s], wherever it leads them, however it leads [them] to answer these questions."[98]  After the court concluded its

---

[93] ROA.3571-73.

[94] ROA.3575-80; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2 (West Supp. 2018) (mandating that the jury answer two issues: (1) "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"; and (2) "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed").

[95] ROA.3575.

[96] ROA.3575-3578.

[97] ROA.3579-3582.

[98] ROA.3582.

16

No. 18-70015

general voir dire, the prosecution and defense agreed to remove more members of the venire without further questioning.[99]

Stringer's individual voir dire began the following Monday, on May 22, 2006.[100] The exchange between Stringer and the court in its entirety was as follows:

Court:      Hello, Mr. Stringer. How are you?

Stringer:   Fine.

Court:      You may be seated. Mr. Stringer, I noticed you the other day. I noticed that you were paying attention to what I was saying. Obviously, this is a very important case with potentially a very serious potential punishment, if you find the Defendant guilty of capital murder, and if you answer these questions in a particular way as I explained.

Do you have any moral, religious, or conscientious objection to the imposition of death in an appropriate capital murder case?

Stringer:   Death bothers me a little bit. Makes me uncomfortable talking about it, but other than that.

Court:      And let me tell you this, it's not an easy job to be on a jury, it's hard because you're sitting in judgment of another person. No one is going to tell you that it's easy because it's not. But the fact of the matter is, just to be perfectly blunt and straightforward and bottom line, if this man is found guilty and you-all answer these questions in a particular way, I impose the sentence of death.

There are some people that tell us they can participate, and some tell us they can't. There are some people that tell us, you know, Judge, I believe in the death penalty, but I could never be a participant where a person ultimately could get the death penalty. And those people, obviously, are not appropriate jurors for this type of case. So, only you know the answers and there are no right answers, and there are no wrong answers. We've already gone through 248 people.

---

[99] ROA.3587.
[100] ROA.3764, 3797.

No. 18-70015

> You are No. 249. And we only have nine jurors. We got to have 12. So, we're still looking.
>
> Obviously, there are people that feel all types of ways. But how do you feel? You're telling me that you feel uncomfortable with death. What does that mean?

Stringer:   Anything about it pretty much.

Court:   So, when you say, "anything about it," does that mean, and I don't want to put words in your mouth, you have to tell me, now is the time. Because the worst thing that would happen is for you to get past this process, you're sitting over there on Monday, June the 19th, and you go, hey, Judge, guess what, I've been thinking about this and I can't do it. By then it's too late. The worst thing is that you didn't say anything at all and you end up, not only lying to yourself but you're lying to us, the Court, so only you know.

> So, let me ask you this question again and you have to say yes or no, not I think, maybe, you know, that kind of thing. We need to know precisely, yes, you can or no, you can't. Okay. How you feel. Do you have any objections—any moral, conscientious or religious objections to the imposition of the death penalty in an appropriate capital murder case?

Stringer:   Yes.

Court:   Yes; which, morally, religiously, conscientiously, which objection do you have?

Stringer:   Morally and conscientiously.

Court:   Okay. Morally and conscientiously.[101]

The prosecution then moved to strike Stringer for cause.[102] Defense counsel responded, "I don't believe he's disqualified, Your Honor. I have no questions because I don't believe he's disqualified."[103] The trial court dismissed Stringer and overruled defense counsel's objection.[104]

---

[101] ROA.3797-800.
[102] ROA.3800.
[103] ROA.3800.
[104] ROA.3800.

On direct appeal, the TCCA rejected Smith's argument that the dismissal of Stringer violated the federal constitution.[105] In addition to Stringer's answers during voir dire, the TCCA considered his questionnaire.[106] The TCCA quoted the statement in Stringer's questionnaire that, "[i]f this is a murder trial, I couldn't [be a juror] [be]cause the talk of death in any way make[s] me uncomfortable."[107] The TCCA recounted that

> [d]uring individual voir dire, the trial court attempted to get some clarification of this statement, and Stringer answered that "anything about [death]" bothered him. Again the trial court attempted to elicit a definitive answer from Stringer, and Stringer finally stated that he was morally and conscientiously opposed to the death penalty even in an appropriate capital-murder case.[108]

The TCCA concluded that "it is clear Stringer's personal feelings against capital punishment would prevent or substantially impair the performance of his duties as a juror, [and] the trial court did not abuse its discretion in granting the State's challenge for cause."[109]

The federal district court disagreed with the TCCA's analysis and conditionally granted habeas relief. The federal district court observed that "Stringer said that he was 'uncomfortable' with the death penalty, but never said, and was never specifically asked, if he was able to put aside his personal feelings and follow the law as instructed by the trial court."[110] The district court noted Stringer's statement in his questionnaire that "its [sic] good that we have [the death penalty] and [it] should be used on the worst of crimes"[111] and his selection of the statement in the questionnaire that "I would consider

---

[105] *Smith v. Davis*, 297 S.W.3d 260, 274 (Tex. Crim. App. 2009).

[106] *Id.*

[107] *Id.* (second, third, and fourth alterations in original) (quoting ROA.8150).

[108] *Id.* (second alteration in original) (quoting ROA.3799).

[109] *Id.*

[110] ROA.447.

[111] ROA.447 (alterations in original) (quoting ROA.8148).

all of the penalties provided by the law and the facts and circumstances of the particular case."[112]   The federal district court concluded that Stringer "is the kind of juror the Court cautioned about in *Witherspoon*"[113] and that there was no "basis for determining that [Stringer] would be substantially impaired in his ability to follow the law."[114]

The State seeks reversal.  Smith urges us to uphold the federal district court's decision on this issue, presenting four arguments.

**B**

Smith's first contention is that the trial court's use of the phrase "in an appropriate capital murder case" did not establish whether "the potential juror could *set aside her objections* in an appropriate case if she believed the evidence presented in court was sufficient to answer the special issues presented to the jury in a way that would lead to a death sentence."  Smith contends that a finding of impairment could not be made without additional questions regarding Stringer's objections to the death penalty and the affect those objections would have on his ability to serve.

Smith argues that the question posed to Stringer differs materially from the question the Supreme Court held in *Darden v. Wainwright* was adequate to elicit whether there was substantial impairment.[115]  That question was: "Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?"[116]  In the present case, the question twice posed to Stringer was:

---

[112] ROA.447 (quoting ROA.8149).
[113] ROA.447.
[114] ROA.448.
[115] *See Darden v. Wainwright*, 477 U.S. 168, 175-76 (1986).
[116] *Id.*

"Do you have any objections—any moral, conscientious, or religious objections to the imposition of the death penalty in an appropriate capital murder case?"[117]   Smith asserts that part of this question was "expressly deemed inadequate in *Witherspoon*" and that "merely adding the phrase 'in an appropriate case' to the question expressly deemed inadequate" did not "render[] the question adequate."

The Supreme Court held in *Witherspoon v. Illinois* that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."[118]  The Supreme Court explained that, "[i]f the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty."[119] "But," the Court said, when the State "swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality."[120]

Since that 1968 decision, the Supreme Court has clarified *Witherspoon*. In *Wainwright v. Witt*, the Court said, "We . . . take this opportunity to clarify our decision in *Witherspoon*, and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may

---

[117] ROA.3797, 3799.
[118] 391 U.S. 510, 522 (1968).
[119] *Id.* at 520.
[120] *Id.*

21

be excluded for cause because of his or her views on capital punishment."[121]

The standard quoted from *Adams* was:

> This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.[122]

In contrasting the *Adams* standard with that of *Witherspoon*, the Court observed that the now-applicable standard "does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism."[123] The Court continued,

> What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.[124]

The Court confirmed that "[d]espite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."[125] In those situations, "deference must be paid to the trial judge who sees and hears the juror."[126]

---

[121] *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

[122] *Id*. at 420 (quoting *Adams*, 448 U.S. at 45).

[123] *Id*. at 424.

[124] *Id*. at 424-25.

[125] *Id*. at 425-26.

[126] *Id*. at 426.

The *Wainwright v. Witt* decision then considered "the degree of deference that a federal habeas court must pay to a state trial judge's determination of bias."[127]  The Court explained that "whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge."[128]

A subsequent decision of the Supreme Court explained that "[d]eference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias."[129]

> The judgment as to "whether a venireman is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.  Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less."[130]

"[T]he finding[s] may be upheld even in the absence of clear statements from the juror that he or she is impaired."[131]  "Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.'"[132]

> Even when "[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty," the need to defer to the trial court

---

127 *Id.*

128 *Id.* at 422.

129 *Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (citing *Witt*, 469 U.S. at 430).

130 *Id.* (alteration and omission in original) (quoting *Witt*, 469 U.S. at 428).

131 *Id.* (citing *Witt*, 469 U.S. at 424-25).

132 *Id.* (alterations in original) (quoting *Witt*, 469 U.S. at 434).

remains because so much may turn on a potential juror's demeanor.[133]

Review of *Witherspoon–Witt* claims on federal habeas is "doubly deferential."[134] For a decision to be contrary to or an unreasonable application of federal law, it must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[135] Based on the Supreme Court's precedents and the record in this case, we cannot say the TCCA's decision is contrary to or an unreasonable application of federal law as determined by the Supreme Court.

Stringer said in his questionnaire that he "couldn't" be a juror because "the talk of death an [sic] any way" made him "uncomfortable."[136] During his individual voir dire, he said, "Death bothers me a little bit. Makes me uncomfortable talking about it, but other than that."[137] When the state court followed up on that answer, asking "You're telling me that you feel uncomfortable with death. What does that mean?" Stringer said, "Anything about it pretty much."[138] These statements would cause a reasonable jurist to question whether Stringer was substantially impaired as a juror in both the guilt and penalty phases of a murder trial.

Viewing the record as a whole, the state trial court communicated to Stringer that it needed to know whether he was a person who "could never be a participant where a person ultimately could get the death penalty" and that

---

[133] *Id.* at 8 (alterations in original) (quoting *Darden v. Wainwright*, 477 U.S. 168, 178 (1986)).

[134] *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (per curiam) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

[135] *White v. Woodall*, 572 U.S. 415, 419-20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

[136] ROA.8150.

[137] ROA.3798.

[138] ROA.3798-99.

"[w]e need to know precisely, yes, you can or no, you can't."[139]  The state trial court made two references to the special issues that would be asked in the penalty phase of a capital trial and explained that if they were answered "in a particular way," the death penalty would be imposed.[140]  The trial court then said, "There are some people that tell us they can participate, and some people tell us they can't."[141]  A reasonable interpretation of this statement is that some people can participate in the process and answer the questions based on the facts of the case and others could not participate in the process because they could not answer the questions in a way that would result in the death, regardless of the facts of the case.  The question "Do you have any objections— any moral, conscientious or religious objections to the imposition of the death penalty in an appropriate capital murder case" is not as precise as it might have been.  But it plausibly inquired whether, "in an appropriate capital murder case," meaning one in which Stringer thought it would otherwise be appropriate to impose the death penalty in light of the questions asked during the penalty phase, Stringer would personally have any moral, conscientious, or religious objections to voting to impose the death penalty.  He said, "Yes," he would.[142]   He then said his objection would be "[m]orally and conscientiously."[143]

Further, the trial court's statement that "I noticed you [Stringer] the other day. I noticed that you were paying attention to what I was saying," reflects that Stringer's demeanor was noteworthy to trial court.[144]   This

---

[139] ROA.3798, 3799.
[140] ROA.3575-82, 3797.
[141] ROA.3798.
[142] ROA.3799.
[143] ROA.3799-800.
[144] ROA.3797.

No. 18-70015

statement was not part of the trial court's pattern during the individual voir
dires. At the least, there was an ambiguity as to Stringer's ability to set aside
his personal views and to follow Texas's statutory scheme and truthfully
answer the questions submitted by the state trial court. "[A]ided, as it
undoubtedly [was] by its assessment of [the venireman's] demeanor," the state
trial court was entitled to resolve that ambiguity in favor of the State.[145]

## C

Smith argues that though the state trial court's decision to exclude
Stringer is "due deference," that "does not foreclose the possibility of reversal."
We of course agree that AEDPA's deferential standard of review does not
foreclose the possibility of relief. "[A] reviewing court may reverse the trial
court's decision where the record discloses no basis for a finding of substantial
impairment."[146] "But where . . . there is lengthy questioning of a prospective
juror and the trial court has supervised a diligent and thoughtful voir dire, the
trial court has broad discretion."[147]

Smith asserts that the state trial court's voir dire of Stringer "was
anything but thoughtful and diligent." Applying AEDPA's "doubly deferential"
standard of review, we cannot say that there was no basis for the state trial
court's finding of substantial impairment. The TCCA did not unreasonably
apply clearly established federal law in this regard.

Smith relies on an opinion by the TCCA to argue that "[b]efore a
prospective juror may be excused for cause . . . , the law must be explained to
him, and he must be asked whether he can follow that law, regardless of his

---

[145] *See Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (third alteration in original) (quoting
*Wainwright v. Witt*, 469 U.S. 412, 434 (1985)).

[146] *Id.* at 20.

[147] *Id.*

personal views."[148]   That rule was announced by a Texas court, not the Supreme Court, and it therefore does not constitute clearly established federal law.   "[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."[149]

## D

Smith contends that his trial counsel's decision not to question Stringer is not a reason to find it was proper to dismiss him for cause.  The TCCA's opinion stated, "Defense counsel declined to question Stringer, but objected to the State's challenge for cause."[150]  We do not take this statement as indicating that the TCCA relied on counsel's decision not to question Stringer as a basis for declining to reverse the state trial court's judgment.  The statement was no more than a factual recitation regarding the proceedings in the trial court, as is evident from the statement's inclusion of the fact that defense counsel objected to the State's challenge for cause.

Smith's argument on this point is also responsive to arguments by the State that the federal district court should have considered other instances during voir dire when Smith's counsel asked questions of potential jurors.  We need not consider this argument by the State, and accordingly, we do not consider Smith's response to it.

## E

Arguing that there is no indication in the record that the state trial court considered Stringer's questionnaire and that Stringer had not been "instructed on the law" when he filled out the questionnaire, Smith contends that we

---

[148] *Id.* at 28 (omission in original) (quoting *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009)).

[149] *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).

[150] *Smith v. State*, 297 S.W.3d 260, 274 (Tex. Crim. App. 2009).

should not consider it. At oral argument, however, Smith's counsel conceded that the state trial court could properly rely on the questionnaire.

There is considerable evidence that the trial court had the potential juror's questionnaires during the individual voir dires. It was not unreasonable for the TCCA to have assumed that during Stringer's individual questioning, the state trial court sought clarification of a statement in Stringer's questionnaire.[151]

In any event, during his individual voir dire Stringer repeated the same statement from his questionnaire that the TCCA quoted in its decision on direct appeal, as the TCCA noted.[152] There can be no harm in the TCCA's consideration of this statement from the questionnaire when the statement was repeated in the presence of the trial court.

Nor did the TCCA, as contended by Smith, rely solely or even predominantly on this statement. The TCCA said, "Stringer finally stated that he was morally and conscientiously opposed to the death penalty even in an appropriate capital-murder case" and concluded that "[a]s it is clear Stringer's personal feelings against capital punishment would prevent or substantially impair the performance of his duties as a juror, the trial court did not abuse its discretion in granting the State's challenge for cause."[153]

## F

In sum, the state court proceedings concerning the exclusion of Stringer as a juror did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[154]  Nor did the state court

---

[151] *See id.*

[152] *Id.*

[153] *Id.*

[154] 28 U.S.C. § 2254(d)(1).

28

proceedings "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[155]  The federal district court did not give appropriate deference to the TCCA's determination that the trial court did not violate the federal constitution when it removed Stringer for cause.  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[156]  Smith has not made that showing.  "[F]ederal habeas review of a *Witherspoon–Witt* claim—much like federal habeas review of an ineffective-assistance-of-counsel claim—must be 'doubly deferential.'"[157]

## V

The federal district court denied all of Smith's other claims for habeas relief.  But Smith maintains that we should affirm the district's court's judgment on the alternate basis that he was denied effective assistance of counsel at the sentencing phase, citing *Strickland v. Washington*.[158]  To prevail on a *Strickland* claim, he must show "(1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense."[159]  Review of *Strickland* claims is always deferential, and when we review a state court determination under AEDPA, review is "doubly deferential."[160]

---

[155] *Id.* § 2254(d)(2).

[156] *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419-420 (2014)).

[157] *Id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

[158] 466 U.S. 668 (1984).

[159] *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Strickland*, 466 U.S. at 689-94).

[160] *Burt,* 571 U.S. at 15 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

No. 18-70015

## A

Smith argues that trial counsel failed to conduct a reasonable sentencing investigation. He asserts that counsel failed to follow the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (ABA Guidelines). He also argues that counsel was deficient by failing to present evidence that Smith suffered from schizophrenia.

To establish deficient performance, Smith must show "counsel's representation 'fell below an objective standard of reasonableness'" under prevailing professional norms.[161] "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[162]

When Smith was first incarcerated at the age of eighteen, he was admitted to a psychiatric unit because he was suicidal and depressed.[163] He was soon readmitted because he was reported to be delusional, paranoid, and experiencing auditory hallucinations.[164] He referred to fear of being killed by a demon and complained of seeing ghosts.[165] Immediately after he was released he was readmitted, claiming that he believed demons were going to stop his heart that night.[166] He later admitted to crisis center staff that he was not possessed by demons.[167] He reportedly rubbed a Bible on his chest to exorcise the demons, rubbing so hard that he injured himself and the Bible.[168]

---

[161] *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688).

[162] *Strickland*, 466 U.S. at 690.

[163] ROA.5857.

[164] ROA.5882.

[165] ROA.5883.

[166] ROA.5884.

[167] ROA.5884.

[168] ROA.5958.

30

Trial counsel was aware of these records and had Smith evaluated by mental health professionals.[169]

Trial counsel retained the type of defense team recommended by the ABA Guidelines.[170]  Trial counsel engaged a fact investigator (Molli Steinle), a mitigation specialist (Bettina Wright), a neuropsychologist (Dr. Mark Lehman), and a psychiatrist (Dr. George Leventon).[171]  After a "clinical interview," psychological and neuropsychological testing, and a "review of extensive records,"[172] Dr. Lehman concluded that Smith did not have significant psychological issues.[173]

Dr. Leventon also reviewed Smith's high school records, Social Security records, criminal history, disciplinary records from his prior incarceration, and medical records from his prior incarceration.[174]  Smith told Dr. Leventon that he shot both victims.[175]  Smith also told Dr. Leventon that he had fabricated the delusions reported in his prison records and that he never suffered from them.[176]  Dr. Leventon diagnosed Smith with "malingering and an antisocial

---

[169] ROA.6153 ("I was well aware of the record information concerning Mr. Smith's 'breakdown' while incarcerated in the penitentiary."); ROA.6154 ("We obtained all the available records with regard to Mr. Smith.  All the records reviewed by Dr. Bekh Bradley-Davino, Ph.D., and mentioned in the affidavit referenced in Mr. Smith's application for writ of habeas corpus, were collected by the investigators pursuant to my direction and were reviewed by me.  They were also made available to the psychiatrist, Dr. Leventon, who examined Mr. Smith.") ROA.6195; ROA.7461-62.

[170] *See* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 4.1A (2003) ("The defense team should consist of no fewer than two attorneys . . . an investigator, and a mitigation specialist" and "should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.").

[171] ROA.6153.

[172] ROA.7934 (capitalization omitted).

[173] ROA.7939.

[174] ROA.7846.

[175] ROA.7855-56.

[176] ROA.7857.

personality disorder" and conveyed the diagnosis to Smith's defense attorneys.[177] Dr. Leventon did not interview any of Smith's family members.[178]

Trial counsel interviewed Smith as well as his family members.[179] Counsel interviewed Smith's mother, father, sister, and brothers on multiple occasions.[180] Counsel interviewed Smith's aunt, ex-sister-in-law, ex-girlfriend, and teachers who remembered Smith from his days in school.[181] Counsel also interviewed a woman with whom Smith lived shortly after he was released from prison and not long before the murders for which Smith was convicted.[182] None indicated that Smith had any family history of mental illness.[183]

Smith now argues that counsel rendered deficient performance because the experts were not informed of a family history of mental illness or witness statements confirming his prior hallucinations. He argues that counsel did not follow ABA Guideline 10.7 and failed to conduct a "multi-generational investigation . . . extend[ing] as far 'as possible vertically and horizontally'" that included "at least three generations."[184] As part of his habeas application, Smith included affidavits from family members that claim other members of his family suffer from mental illness.[185] Habeas counsel also retained Dr. Bekh Bradley-Davino, Ph.D., to "conduct a comprehensive psychiatric evaluation of

---

[177] ROA.7858.

[178] ROA.7875-76.

[179] ROA.6153-54

[180] ROA.6154.

[181] ROA.6154.

[182] ROA.6154.

[183] ROA.6154.

[184] *See* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10.7 cmt. & n.216 (2003).

[185] ROA.256 (Johnny Carl Miles, uncle); ROA.260 (Felicia Davis, maternal cousin); ROA.262 (Deondrea Smith, younger brother); ROA.284 (Kendal Ray Smith, older brother); ROA.291 (Christopher Thurman, family friend); ROA.297 (Mark Lemons, cousin).

[Smith]."[186]    Dr. Bradley-Davino diagnosed Smith with schizophrenia, paranoid type.[187]   He considered a history of mental illness in Smith's family. Smith's maternal uncle, Johnny Miles, "indicate[d] that other members of Mr. Smith's maternal family displayed unusual symptoms and behaviors."[188] Miles specifically stated that another uncle, Craven Brooks, "was institutionalized at one point in his life."[189]  Dr. Bradley-Davino reviewed the medical records of Vincent Davis,[190] Smith's cousin, who has been diagnosed with schizophrenia.[191]   Two other family members, an uncle named Lee Arthur Miles and Smith's maternal grandmother, also apparently "had unusual experiences such as seeing spirits."[192]

Smith points to an affidavit by Dr. Lehman that states that, had he been provided the same affidavits that Dr. Bradley-Davino reviewed that allegedly corroborate Smith's symptoms, his own diagnosis of Smith might have been different.[193]  Dr. Lehman said specifically he "would not exclude a diagnosis of schizophrenia."[194]

Smith relies on *Rompilla v. Beard*[195] to argue that counsel should have done more to investigate mitigating evidence, particularly his mental health. Smith quotes from *Rompilla*: "[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain

---

[186] ROA.269.
[187] ROA.270.
[188] ROA.278
[189] ROA.257, 278.
[190] ROA.269.
[191] ROA.257, 260, 267.
[192] ROA.278.
[193] ROA.303.
[194] ROA.303.
[195] 545 U.S. 374, 377 (2005).

and review material . . . ."[196]  However, Smith omits the end of that sentence: "his lawyer is bound to make reasonable efforts to obtain and review material *that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial*."[197]  In *Rompilla*, the defendant's trial attorneys had presented weak mitigating evidence and the Supreme Court discussed the availability of potential mitigating evidence from the prisoner's school records and prior incarcerations.[198]  However, the Court granted relief because "the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction."[199]  Rompilla's trial attorneys never examined the file from a previous conviction for a similar crime, despite notice from the prosecution that it would rely on the details of that crime to prove aggravating factors and obtain the death penalty.[200]  After finding that counsel's failure to review the file was unreasonable, the Court had no difficulty finding prejudice.[201]  The file contained prison records that painted a wholly different picture of the defendant's mental health and childhood that would have led them down a different investigative path.[202]

Smith's evidence does not come close to the trove of easily accessible evidence in *Rompilla*.  The state habeas court found that the affidavits that Dr. Bradley-Davino relied upon were "self-serving and unpersuasive to demonstrate that the applicant suffers from the negative phase of schizophrenia."[203] Further, nothing that Smith's trial attorneys had uncovered

---

[196] *Id.*
[197] *Id.* (emphasis added).
[198] *See id.* at 381-83.
[199] *Id.* at 383.
[200] *Id.* at 383-85.
[201] *Id.* at 390-93.
[202] *Id.* at 390-91.
[203] ROA.7468.

prior to trial had led them to any family history of mental illness. Smith himself and his family all reported no mental illness in the family. Decisions not to investigate are reasonable to the degree the evidence makes those decisions reasonable.[204] In *Rompilla*, it was unreasonable to fail to investigate records because the prosecution indicated it would rely on those records, not because there was mitigating information in the file.[205] Smith has not shown that counsel's reliance on its retained mental health experts was unreasonable, let alone that the TCCA's determination of his *Strickland* claim was unreasonable.[206]

Nor has Smith shown that trial counsel performed in a constitutionally defective manner by failing to present evidence of his alleged mental illness. The state habeas court determined that Smith has not shown that he suffers from schizophrenia,[207] and Smith has not presented clear and convincing evidence that this factual determination was incorrect.[208] We have also recognized that evidence of mental illness can be a "double edge sword," in that it could be both aggravating and mitigating.[209] Further, adducing evidence of Smith's alleged schizophrenia would have opened the door to cross-examination. Smith told Dr. Leventon that the delusions described in his prison records had been feigned and that he never suffered from them.[210] Dr. Leventon diagnosed Smith with "malingering and an antisocial personality

---

[204] *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)).

[205] *See Rompilla*, 545 U.S. at 383-85.

[206] *See Harrington v. Richter*, 562 U.S. 86, 107 (2011) ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

[207] ROA.7469.

[208] *See* 28 U.S.C. § 2254(e)(1).

[209] *Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000)).

[210] ROA.7857.

disorder" and conveyed the diagnosis to Smith's defense attorneys.[211] Cross-examination of Dr. Leventon would have opened the door to Smith's confession to Dr. Leventon that Smith shot and killed Tammie White and her eleven-year-old daughter Kristina White.[212] We agree with the TCCA that defense counsel made a reasonable tactical decision to pursue a mitigation strategy based on Smith's impoverished upbringing, religious faith, and deep remorse for the killings. In light of our "doubly deferential" review, Smith is not entitled to habeas relief on this claim.

## B

Even assuming Smith's trial counsel's performance was deficient, Smith has not established prejudice. To establish prejudice, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[213] In sentencing, the evidence must be such that "there is a reasonable probability that at least one juror would have struck a different balance" among mitigating and aggravating factors that would result in a sentence of life instead of death.[214]

Smith points to the statement in Dr. Lehman's affidavit that he "would not exclude a diagnosis of schizophrenia,"[215] the report of Dr. Bradley-Davino,[216] and affidavits from family members and friends that purport to confirm Smith's mental illness.[217] He argues that this new evidence, if found

---

[211] ROA.7858.

[212] *See* ROA.7855-56.

[213] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[214] *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

[215] ROA.303.

[216] ROA.269.

[217] *See* ROA.256 (Johnny Carl Miles, uncle); ROA.260 (Felicia Davis, maternal cousin); ROA.262 (Deondrea Smith, younger brother); ROA.284 (Kendal Ray Smith, older brother); ROA.291 (Christopher Thurman, family friend); ROA.297 (Mark Lemons, cousin).

and presented to the jury, could cause at least one juror to weigh the aggravating and mitigating factors in favor of life.

This evidence is not as strong as Smith portrays it. Dr. Lehman's affidavit does not establish that Smith had schizophrenia. It says merely that he would not have excluded such a diagnosis.[218] In light of the other evidence that the jury likely would have heard in addition to Dr. Lehman's testimony, that slight suggestion of mental illness is insufficient to show prejudice. Evidence that Smith previously lied about experiencing hallucinations and was diagnosed with malingering would have damaged his credibility with the jury. Likewise, the report of Dr. Bradley-Davino, while more certain of its conclusion that Smith suffered from mental illness, ignored evidence that the State could have used to cast doubt on its findings. Indeed, the TCCA found that Dr. Bradley-Davino's diagnosis was unpersuasive based on his report and testimony at the evidentiary hearing because he (1) did not reference or acknowledge in his report any of Smith's admissions to Dr. Leventon and defense counsel that Smith lied about being possessed by demons, and (2) omitted several clinical notes from his report that support an alternative diagnosis of malingering, among other evidence that casts doubt on the schizophrenia diagnosis.[219] Smith has not explained how the state habeas court was unreasonable in its assessment of Dr. Bradley-Davino.

In contrast, the aggravating factors were overwhelming. In addition to the grisly details of the crime from the guilt–innocence phase, there is evidence that Smith intended to murder a third victim.[220] The State also introduced evidence of his long string of criminal activities. Smith had one juvenile

---

[218] ROA.303.

[219] *See* ROA.7467.

[220] *Smith v. State*, 297 S.W.3d 260, 265 (Tex. Crim. App. 2009).

delinquency[221] and three felony drug convictions.[222]    He admitted to burglarizing the home of a hospitalized, elderly woman.[223]    Weighed against the State's strong evidence of future dangerousness, Smith's weak evidence of mental illness is insufficient to create "a reasonable probability that at least one juror would have struck a different balance" among mitigating and aggravating factors that would have resulted in a sentence of life instead of death.[224]

## VI

Smith asks us to affirm the district court's grant of habeas relief on the basis that evolving standards of decency render those with "severe mental illness" ineligible for the death penalty under the Eighth Amendment.    A glaring omission in Smith's filings in our court is that he does not challenge any of the state habeas court's factual findings or conclusions of law regarding his mental health in connection with his claim that he is ineligible for the death penalty.    Accordingly, even were there authority from the Supreme Court establishing that the federal constitution prohibits the execution of the severely mentally ill, Smith does not challenge the state trial court's determination on the merits that he is not severely mentally ill.

In adjudicating Smith's claim that he suffers from schizophrenia and is ineligible for the death penalty, the state habeas court held an evidentiary hearing and made factual findings.[225]    The state habeas court ultimately concluded that Smith had failed to "demonstrate by a preponderance of the evidence that he suffers from schizophrenia in light of his multiple admissions

---

[221] ROA.5421-22.
[222] ROA.5233-42.
[223] ROA.4702.
[224] *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).
[225] ROA.7455-75.

of duplicity, evidence of malingering, and diagnosis of an antisocial personality disorder."[226]  We cannot say that in adjudicating Smith's claim of ineligibility for the death penalty, the state-court determinations "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"[227] since Smith has not challenged the reasonableness of the state court's determination of the facts regarding this ineligibility claim.

With regard to the TCCA's application of clearly established federal law, Smith does not cite any decision of the Supreme Court holding that the severely mentally ill are ineligible for execution.  Instead, he argues that those who are severely mentally ill are similar to the intellectually disabled[228] and juvenile offenders[229] and therefore the severely mentally ill lack the moral culpability to permit a sentence of death.  We have rejected this argument before.[230]  Smith does not contend that his "'concept of reality' is 'so impair[ed]' that he cannot grasp the execution's 'meaning and purpose' or the 'link between [his] crime and its punishment.'"[231]  The TCCA's decision on this issue was not contrary to clearly established federal law.

*       *       *

For the foregoing reasons, we REVERSE the judgment of the district court in part, to the extent that it conditionally granted habeas relief to Smith

---

[226] ROA.7476.

[227] 28 U.S.C. § 2254(d)(2).

[228] *See Atkins v. Virginia*, 536 U.S. 304, 316 (2002).

[229] *See Roper v. Simmons*, 543 U.S. 551, 578 (2005).

[230] *See Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (per curiam).

[231] *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 958, 960 (2007)); *see also id.* at 722 (holding that the Eighth Amendment does not "forbid execution whenever a prisoner shows that a mental disorder has left him without any memory of committing his crime . . . because a person lacking such a memory may still be able to form a rational understanding of the reasons for his death sentence").

on his first claim for relief, and we otherwise AFFIRM the district court's judgment.