# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2021

Lyle W. Cayce
Clerk

No. 19-70019

Gary Green,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CV-2197

Before Dennis, Elrod, and Duncan, *Circuit Judges*.

Per Curiam:[*]

Gary Green was convicted of capital murder in Texas state court. Following Green's unsuccessful direct appeal and state postconviction proceedings, Green filed a petition for a writ of *habeas corpus* in federal district court. The district court denied Green's petition and denied him the

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

certificate of appealability ("COA") that would allow him to appeal the denial. *See Green v. Davis*, 414 F. Supp. 3d 892, 895 (N.D. Tex. 2019). He now moves this court for a COA. Because reasonable jurists would not debate the correctness of the district court's determinations, we DENY Green's motion.

## I.  Background and Procedural History

### A.  Green's Background and the Offense

Gary Green asserts that he has had a life-long history of psychiatric disorders. Several members of his family suffered from severe mental illness, and Green's father allegedly violently abused Green and his mother when he was a child. Throughout his life, Green purportedly exhibited signs of paranoia and mental illness, including speaking of and attempting suicide, believing others were out to "get him," hearing demons, and believing vampires were following him.

In 2010, Green was indicted on a single count of Capital Murder for the September 21, 2009 deaths of his wife, Lovetta Armstead, and her six-year-old daughter, Jazzmen Montgomery. About a month prior to the killings, Green had checked himself into a mental hospital, where he was diagnosed with major depressive disorder with psychotic features and prescribed a schizophrenia medication. The hospital determined that Green did not need to be committed and discharged him. Two days later, a different doctor diagnosed Greene with bipolar disorder in an outpatient setting.[1]

Then, about a week before the date of the offenses, Green learned that Armstead was seeking to have their marriage annulled. On the day of the crime, Armstead wrote two notes to Green stating that, although she loved

---

[1] According to Green, both diagnoses were incorrect and the prescription was inappropriate for his condition.

Green, she had to do what was best for her, and that meant their parting ways and Green moving out of their home immediately. When Green read the notes, he wrote a note in response that expressed his rage and belief that Armstead and her children were involved in a plot against him. The note stated that Green planned to take five lives, including his own. Green then fatally stabbed Armstead and drowned Montgomery in a bathtub.

After Green killed Armstead and Montgomery, he also attempted to kill Armstead's sons, Jerome and Jerrett. The boys convinced Green to spare their lives, and they later recounted that Green told them he had killed Armstead because he loved her "to death" and did not want a divorce. Green told the boys that he intended to kill himself and then attempted suicide by consuming a large amount of Tylenol and Benadryl.

The attempt was unsuccessful, and several hours later, Green turned himself into police and proceeded to confess to the killings. During the confession, Green told police that he had heard voices in his head telling him to kill Armstead and her children, that he believed the family was plotting against him, and that he thought by killing the family he would ensure that they would all be reunited in heaven.

## B. State Court Proceedings

### 1. Trial and Direct Appeal

At trial, the State presented various testimony and other evidence of the events just recounted, including the note Green had written and a video of Green's confession. Green's trial counsel presented no evidence during the guilt/innocence phase of the trial, and one of his attorneys stated to the jury in closing that the State had established its case, the proof was undeniable, and counsel expected the jury to find Green guilty. The jury convicted Green as charged.

During the punishment phase of the trial, the State presented evidence of Green's previous violent conduct. The State first introduced testimony by Green's high school girlfriend Jennifer Wheeler that after she broke up with Green, she gave Green a ride home one morning when she saw him at a bus stop near her house. During this encounter, Green forced Wheeler into the passenger seat, drove her to a park, strangled her with his shoelaces, and stabbed her in the chest. He then drove Wheeler to the hospital, where he lied and told her family that she had been robbed. Green pled guilty to aggravated assault based on the incident.

The State also presented testimony from Shulonda Ransom, another of Green's ex-girlfriends and the mother of his child. Ransom testified that Green physically abused her by hitting and choking her while she was pregnant with their son—once, to the point that Ransom lost consciousness. Last, the State introduced evidence that Green had been involved in an armed robbery of a grocery store to which he later confessed.

Green's trial counsel presented evidence of the extensive history of mental illness and abuse in Green's family. This included the testimony of Dr. Gilbert Martinez, who had performed a clinical psychological and neurological examination of Green following Green's killing of Armstead and Montgomery. Dr. Martinez opined that Green suffered from schizoaffective disorder of the bipolar type, severe chronic depression, and manic episodes or bipolarity. Martinez further stated that Green exhibited features of paranoid personality disorder, borderline personality disorder, and avoidant personality disorder.

The defense also introduced evidence that Green performed poorly in school, consistently scoring in the lowest 10% of his cohort, but had nonetheless never received any special education. Dr. Martinez testified that

Green is not intellectually disabled but has a full-range IQ of only 78 or 79, which places him at the higher end of the "borderline" range.

After the close of evidence, the jury found by special verdict that there was "a probability that the Defendant, Gary Green, would commit future criminal acts of violence that would constitute a continuing threat to society" and that "taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, Gary Green, [there was not] a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." The trial court sentenced Green to death as required by Texas law. Green appealed to the Texas Court of Criminal Appeals ("TCCA"), which affirmed his conviction, and the United States Supreme Court denied Green's petition for a writ of certiorari. *Green v. State*, 133 S. Ct. 2766 (2013).

### 2. State Habeas Petition

Green then filed a state *habeas* petition. In his petition, Green asserted twenty claims for relief. These included, as relevant here, that under *Atkins v. Virginia*, 536 U.S. 304 (2002), the Eighth Amendment prohibited executing him because he is intellectually disabled; that, under *Atkins*, the Eighth Amendment prohibited executing Green because he is mentally ill; and that Green was denied due process as guaranteed by the Fourteenth Amendment because jurors saw him in shackles without the trial court finding that the restraints were necessary. Green also raised a range of claims that collectively alleged his trial counsel was constitutionally ineffective for failing to investigate or present various evidence relating to Green's *Atkins* claims and his claim of diminished capacity due to mental illness at the time he committed the offense.

Following an extensive evidentiary hearing, the state court issued its findings of fact and conclusions of law, recommending that the petition be denied. On June 24, 2015, the TCCA issued an order adopting the state *habeas* court's findings and conclusions. *Ex parte Green*, No. WR-81,575-01, 2015 WL 3899220, at *1 (Tex. Crim. App. June 24, 2015). The TCCA also stated without further explanation that, alternatively, Green's mental-illness-based *Atkins* claim and his claims related to his shackling during trial were procedurally barred.[2] *Id.* at *1. The TCCA thus denied Green *habeas* relief.

## C. The Present Federal Habeas Petition

On June 13, 2016, Green filed a timely federal *habeas* petition with the U.S. District Court for the Northern District of Texas that asserted largely similar claims to those that he had raised in his state *habeas* proceeding. With respect to his claims related to his trial counsel's purported ineffectiveness for failing to investigate and litigate Green's diminished capacity at the time of the killings, Green this time focused on his experiencing "abandonment rage" as a result of Armstead's attempts to end their relationship, which he argued would negate the *mens rea* required for a capital murder conviction. Green contended that this was a different claim than the one he had raised in his state *habeas* proceedings, and he argued that his state *habeas* counsel's ineffective assistance was reason to permit him to raise the new claim for the first time in his federal *habeas* petition (as well as to excuse the procedural defaults identified by the TCCA).*See Trevino v. Thaler*, 569 U.S. 413, 422–

---

[2] The TCCA may have concluded that these claims could not be brought in Green's state *habeas* proceeding because they were not raised at trial or on direct appeal. Although these procedural defaults would likely provide an "independent and adequate state ground" for denying federal *habeas* relief on these claims, *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991), we ultimately resolve them on other grounds, *see infra*, n. 4.

427 (2013) (holding ineffective assistance of state-*habeas* counsel may be grounds for raising an otherwise defaulted ineffective-assistance-of-trial-counsel claim); *Martinez v. Ryan*, 566 U.S. 1, 12–14 (2012) (same).

Green also filed two motions seeking funding under 18 U.S.C. § 3599(f) for his federal *habeas* counsel to retain experts to evaluate Green for adaptive deficits in relation to his *Atkins* intellectual-disability claim, as well as to assess whether the mental health evaluation conducted by the defense experts at trial was adequate and to determine whether an adequate evaluation of Green's mental health at the time of the offense could still be performed. The motions were referred to a magistrate judge, who then issued recommendations that the motions be denied. The district court adopted the recommendations in full and denied reconsideration. Then, on September 27, 2019, the district court denied Green's *habeas* petition and denied him a COA to appeal the ruling. Green timely moved this court for a COA.

## II. Standard of Review

Green's substantive claims are governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a federal court may order *habeas* relief on a claim that was adjudicated on the merits by a state court only when the state court's adjudication "resulted in [either] a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or . . . a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *accord Brown v. Payton*, 544 U.S. 133, 141 (2005). To appeal a "final order[] that dispose[s] of the merits of a habeas corpus proceeding," *Harbison v. Bell*, 556 U.S. 180, 183 (2009), Green must obtain a COA certifying that he has made "a substantial showing of the denial

of a constitutional right." 28 U.S.C. § 2253(c)(2). A COA will issue if Green demonstrates "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Under our precedents, a COA is not required to appeal a district court's denial of a petitioner's motion for funding for investigative assistance in a *habeas* proceeding. *Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000). We review the district court's denial of funding for an abuse of discretion.[3] *See id.*

## III. Discussion

### A. Green's Request for Funding for Investigatory Services

We first must consider the district court's denial of Green's request for § 3599(f) funding. Subsections 3599(a)(2) and (f) of Title 18 allow a

---

[3] In *Ayestas v. Davis*, 138 S. Ct. 1080, 1089 n.1 (2018), the Supreme Court discussed the COA requirement while reviewing this court's decision on the appeal of a § 3599(f) funding denial, but the Court declined to review our conclusion that no COA was needed in that case. The Court reasoned that it had jurisdiction to review both COA denials and merits rulings and, because it ultimately ruled that the district court in that case had applied the incorrect standard in denying the petitioner's funding request, the Court determined that reversal was appropriate regardless of whether the appealed circuit-court decision was construed as a denial of a COA or an affirmance of the district court's decision on the merits. *See id.* ("[W]e find it unnecessary to resolve the issue. Though we take no view on the merits, we will assume for the sake of argument that the Court of Appeals could not entertain petitioner's § 3599 claim without the issuance of a COA."). As the Supreme Court did not reach the question, we have continued to adhere to our prior precedents holding that an appeal of a district court's denial of a request for *habeas* investigatory funding is not subject to the COA requirement. *See Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020); *Ayestas v. Davis*, 933 F.3d 384, 388 (5th Cir. 2019) (applying the abuse of discretion standard to review the funding denial on remand from the Supreme Court), *cert. denied*, 140 S. Ct. 1107 (2020).

district court to authorize funding for a *habeas* petitioner in a capital case to obtain "investigative, expert, or other services" if the court finds that the defendant is otherwise "financially unable to obtain" the services and the services "are reasonably necessary for the representation of the" petitioner. "Proper application of the 'reasonably necessary' standard . . . requires courts to consider the potential merit of the claims that the applicant wants to pursue, the likelihood that services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Ayestas*, 138 S. Ct. at 1094. "[I]t would not be reasonable—in fact, it would be quite unreasonable—to think that services are necessary to the applicant's representation if, realistically speaking, they stand little hope of helping him win relief." *Id.*

In this case, Green requested up to $39,380 to hire two mental health experts to assess whether the pretrial evaluation of Green performed by the defense's mental health experts was adequate in connection with his *Atkins* and ineffective assistance of counsel claims. As an initial matter, it is not at all clear that the district court would have been permitted to consider any evidence that the funding would have generated had Green's request been granted. Under AEDPA, the focus of federal *habeas* review of claims that were adjudicated on the merits by a state court is the reasonableness of the state court's determinations, and thus the Supreme Court has held that review is ordinarily restricted to the record that was before the state court when it made its decision. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Although Green contends that the claims that he was attempting to advance with his funding request are different from the claims Green presented to the state *habeas* court, the district court concluded that they were the same claims. *See Green*, 414 F. Supp. 3d at 918. If the district court is correct, the *Pinholster* bar to introducing new evidence in a federal *habeas* proceeding would apply. *See Pinholster*, 563 U.S. at 182.

In any event, the district court did not err in concluding that the requested funding could not further viable claims even if the new evidence could be considered. Regarding the *Atkins* claim, the district court determined that successfully demonstrating Green's adaptive deficits would not result in Green prevailing because the lowest IQ score that Green submitted in his state proceedings—78—was too high to make the state courts' finding that he was not intellectually disabled unreasonable. The Supreme Court has defined an intellectually disabled person as an individual with (1) significantly subaverage general intellectual functioning (2) paired with adaptive deficits in multiple basic skill areas (3) that manifest before the age of 18. *Atkins*, 536 U.S. at 309 n.3. As to the first prong, the Supreme Court has held that the "cutoff" for significantly subaverage general intelligence that might qualify one as intellectually disabled is an IQ score of 70. *Id.* at 309 n. 5. Therefore, taking into account a five-point standard error of measurement ("SEM") that reflects the inherent imprecision of IQ tests, the Supreme Court has held that a defendant who demonstrates an IQ score of "between 70 and 75 or lower" satisfies the first criterium of intellectual disability. *Id.*; *Hall v. Florida*, 572 U.S. 701, 722 (2014). In such circumstances, a state court must "move on to consider [a defendant's] adaptive functioning." *Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017).

Green contended in his request for funding that, "[a]fter applying the SEM, an IQ between 70 and 75 or lower is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition" (alterations and internal quotes omitted). Similarly, in his brief in support of his motion for a COA, Green argues that the district court erred because "an IQ-score of 70-75 is *not* an absolute cutoff for prong-1" in light of the Supreme Court's holding in *Hall v. Florida* that "the intellectual-disability determination should consider the [SEM], which is plus-or-minus 5-points

from the score." Green states that, "[a]fter applying the SEM to Green's score of 78 . . . Green may fall within the cutoff for intellectual disability."

Green's argument is based on a misapprehension of *Hall*'s discussion of the SEM. The *Hall* Court held that, because there is a five-point SEM inherent in IQ testing, applying a strict 70-IQ-score cutoff for intellectual disability carries with it "an unacceptable risk that persons with intellectual disability"—that is, persons with IQ scores of 70 or below with adaptive deficits that set in prior to the age of 18—"will be executed." *Hall*, 572 U.S. at 704. The rule that a state court must consider a defendant's adaptive deficits if he demonstrates an IQ score "between 70 and 75 or lower," *Hall*, 572 U.S. at 722, already accounts for the SEM. *See Moore*, 137 S. Ct. at 1049 ("Moore's score of 74, adjusted for the standard error of measurement, yields a range of 69 to 79 . . . . Because the lower end of Moore's score range falls at or below 70, the [T]CCA had to move on to consider Moore's adaptive functioning.") Green's argument that the state court had to consider his adaptive deficits because the lower end of his SEM adjusted IQ score falls into the "between 70 and 75" range would have us double count the SEM.

The district court was thus correct that Green's IQ score of 78 did not fall below the threshold that would make it unreasonable for a state court to find that he is not intellectually disabled without evaluating his adaptive functioning. And, consequently, the district court was correct that the funding Green requested for adaptive testing had no hope of furthering viable *Atkins*-related claims. Because Green's IQ score was not within the range that would obligate the state court to consider his adaptive functioning, demonstrating Green's adaptive deficits would not make the state court's finding that he was not intellectually disabled unreasonable.

The district court also determined that, even if Green retained expert witnesses who would testify that the mental health evaluations performed by the defense experts at trial were inadequate, this would not demonstrate that Green's trial counsel had been ineffective. Such evidence would simply produce a conflict between expert witnesses, the court reasoned, and trial counsel may generally reasonably rely on the evaluations and opinions of experts without being deemed ineffective for doing so, regardless of whether experts with a different opinion can later be produced. The court thus concluded that there was no chance the funding would not further a viable ineffective assistance claim and it therefore was not reasonably necessary to Green's representation, and the court accordingly denied the motions.

To prevail on his ineffective assistance claims under the clearly established federal standard set forth in *Strickland v. Washington*, Green must demonstrate both that his trial counsel committed a serious error that fell below an objective standard of reasonableness and that a reasonable probability exists that, but for the error, the defendant would have obtained a different result at trial. 466 U.S. 668, 687–91 (1984). Under the first prong of the inquiry, "[a]n expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and [a defendant] has no constitutional guarantee of effective assistance of experts." *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) (emphasis in original). It is generally not an unreasonable professional error for counsel to trust the opinions of mental health experts when deciding on what defensive theories to pursue. *See, e.g.*, *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."); *Turner v. Epps*, 412 F. App'x 696, 702 (5th Cir. 2011) (unpublished) ("Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses

without worrying that a reviewing court will substitute its own judgment . . . and rule that his performance was substandard for doing so." (quoting *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002), *overruled in part on other grounds*, *Tennard v. Dretke*, 542 U.S. 274 (2004))); *Wilson v. Sirmons*, 536 F.3d 1064, 1089 (10th Cir. 2008) (noting that, to a degree, counsel should be able to rely on an expert to determine what evidence is necessary for an effective evaluation, and what additional evidence the expert needs to complete testing).

This is not to say that defense counsel is not required to seek a second opinion when an expert's evaluation is so clearly deficient or the expert's conclusions so obviously wrong that the shortcomings should be apparent to even defense counsel's untrained eye. *See, e.g., Buck v. Davis,* 137 S. Ct. 759, 775 (2017)*; Wilson*, 155 F.3d at 408 (Michael, J., concurring in part). And defense counsel can render deficient performance by not giving an expert sufficient time to conduct a proper evaluation or by failing to perform an adequate investigation of a defendant's background and character to discover information relevant to a mental health expert's inquiry. *See Walbey v. Quarterman*, 309 F. App'x 795, 800–01 (5th Cir. 2009) (unpublished) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). But the hallmark of these claims is that the unreasonableness of counsel's reliance on the expert is apparent in light of "prevailing professional norms" for *counsel*. *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). Thus, evidence that other mental health experts disagreed with a defense expert's evaluation would not in itself indicate that it was unreasonable for trial counsel to rely on the evaluation. The very fact that an expert opinion is needed to determine whether the defense experts' mental health evaluations were adequate indicates that any deficiency was not so obvious to a lay person that trial counsel's reliance was unreasonable. Accordingly, the district court was correct that the requested services would not further a viable ineffective assistance claim and therefore

were not "reasonably necessary to [Green's] representation."  18 U.S.C. § 3599(f).

## B.  Green's Motion for a COA

We now turn to the merits of Green's *habeas* claims.  As a threshold matter, Green contends that the district court employed the wrong legal standard in evaluating the state courts' decisions.  The district court cited our decision in *Evans v. Davis*, 875 F.3d 210, 216–217 (5th Cir. 2017), for the proposition that "a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision." *Green*, 414 F. Supp. 3d at 908.  Green argues that this rule is incompatible with the Supreme Court's decision in *Wilson v. Sellers*, 138 S. Ct. 1188, 1196–1197 (2018), in which the Court held that, when a state appeals court affirms a lower court decision without explanation, federal *habeas* courts should "look through" to the last reasoned state court decision and, absent contrary evidence, presume that the reviewing court adopted the lower court's reasoning.  It would be unnecessary to identify the reasoning on which the state court decision rests if federal courts only evaluate the ultimate disposition, Green appears to argue.

Green confuses a state court's granular analysis with the overall grounds for a state court's decision.  *Wilson* indicates that a federal *habeas* court should "look through" to the last reasoned state court decision to determine the general basis for a state appeals court's ruling.  138 S. Ct. at 1196–1197.  For example, if a state appeals court affirms without explanation a lower court decision that a *habeas* petitioner's claims fail on the merits, a federal *habeas* court generally should not assume the appeals court instead held that the claims were untimely or otherwise procedurally barred.  *Wilson*

does not suggest that a federal *habeas* court may withhold deference to a state court decision any time a minor flaw that does not affect the ultimate disposition can be identified in its analysis. Such a rule would be inconsistent with 28 U.S.C. § 2254(d)'s requirement that relief be granted only when a state court adjudication "*resulted in a decision* that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" (emphasis added). Moreover, Green fails to identify any area in which the district court's reasoning differed from that of the state *habeas* court's, so it is unclear what effect his proposed rule would have in this case even if he were correct.

As to the merits of Green's *habeas* petition, the district court first considered Green's *Atkins* claims, observing that clearly established Supreme Court precedent prohibits executing an intellectually disabled person. *Green*, 414 F. Supp. 3d at 908–09. The court reviewed the state court proceedings in Green's case, noting that the defense's neuropsychologist Dr. Martinez testified at trial on both direct and cross-examination that Green was not intellectually disabled. *Id.* at 911. Further, during Green's state *habeas* hearing, Green's trial counsel testified that three different mental-health experts evaluated Green prior to trial and all concluded that he was not intellectually disabled. *Id.* And, as discussed above, the lowest IQ score Green submitted during the state proceedings was 78, which is outside of the range that would render it unreasonable for a state court to determine he is not intellectually disabled without considering his adaptive functioning. *See Moore*, 137 S. Ct. at 1049. In any event, as the district court noted, testimony regarding Green's academic, employment, and relationship history that was presented during both Green's trial and state *habeas* proceedings indicated that Green did not suffer from deficits in adaptive skills significant enough to

indicate an intellectual disability. *Green*, 414 F. Supp. 3d at 912–13. Based on this evidence, the district court determined that the TCCA's rejection of Green's *Atkins* intellectual disability claim was not contrary to or an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* at 913.

The district court was, at minimum, correct that the lowest IQ-score Green submitted to the state court was too high to satisfy the first prong of *Atkins*, meaning it was not unreasonable for the state court to find that he was not intellectually disabled. *Atkins*, 536 U.S. at 309 n.3. This alone is sufficient to foreclose relief on his *Atkins* claim, and jurists of reason would not debate whether this conclusion is correct. *See Miller-El*, 537 U.S. at 336.

Next, the district court concluded that the TCCA had adopted the lower state *habeas* court's reasoning in rejecting on the merits Green's argument for extending *Atkins* to prohibit the execution of mentally ill defendants.[4] *Green*, 414 F. Supp. 3d at 914. The denial was not contrary to or an unreasonable application of clearly established federal law, the district court continued, given that the Supreme Court has not applied *Atkins* to prohibit the execution of mentally ill people who are not intellectually disabled and the Fifth Circuit has repeatedly rejected virtually identical arguments on the issue to those raised by Green. *Id.* at 914–15 (citing *Smith v. Davis*, 927 F.3d 313, 339 (5th Cir. 2019); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014); and

---

[4] Title 28 U.S.C. § 2254(b)(2) provides that a federal court may deny *habeas* relief "on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Because we find that the claims at issue lack merit in any event, we do not address the TCCA's alternative ruling that several of Green's claims were procedurally defaulted under state law. *See Ex parte Green*, 2015 WL 3899220 at *1.

*In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006)). The district court was correct that no clearly established federal law prohibits executing mentally ill defendants who are not intellectually disabled, and reasonable jurists would not debate this conclusion.[5]

The district court then turned to Green's claims related to his shackling at trial. The court noted that, under clearly established Supreme Court precedent, states may not use physical restraints that are visible to the jury on a defendant during any phase of a capital proceeding absent special

---

[5] Because these claims are meritless, Green has likewise failed to demonstrate that it was unreasonable for the state court to deny his ineffective assistance claims that were based on his counsel's failure to raise these arguments. Green argues that the district court erred because these ineffective assistance claims are not the same claims that the state court adjudicated on the merits. If we understand him correctly, he contends that, in the state *habeas* proceedings, he argued for a rule categorically excluding mentally ill people from the death penalty, whereas he now argues that the Eighth Amendment prohibits executing specifically him due to the unique characteristics of his particular mental illness. He similarly argues that his claims related to his trial counsel's failure to present evidence of his allegedly diminished capacity due to "abandonment rage" are different from the claims he presented to the state court regarding his allegedly diminished capacity from mental illness more generally. However, 28 U.S.C. § 2254(b) prohibits federal *habeas* courts from granting relief to state prisoners on claims that were not presented in state courts absent a showing of cause for and prejudice from the default. *See Trevino v. Thaler*, 569 U.S. 413, 421 (2013).

Green contends that his state *habeas* counsel was ineffective for not raising these claims in the state *habeas* proceedings and that this ineffectiveness should excuse the procedural default under *Trevino v. Thaler*, 569 U.S. 413, 422–427 (2013) and *Martinez v. Ryan*, 566 U.S. 1, 12-14 (2012). But Green's new claims are arguments for an extension of current law, and, even if we assume *arguendo* that they have enough merit that Green was actually prejudiced by state *habeas* counsel's failure to raise them, Green nonetheless fails to show the error necessary to satisfy the other prong of the ineffective assistance test because "counsel cannot be ineffective for failing to assert a novel extension of the reasoning of a Supreme Court case." *Jones v. Davis*, 673 F. App'x 369, 375 (5th Cir. 2016) (unpublished) (citing *Ragland v. United States*, 756 F.3d 597, 601 (8th Cir. 2014)). Thus, to the extent Green actually did present claims to the district court that were not adjudicated on the merits by the state courts, those claims were procedurally defaulted and barred by § 2254(b).

circumstances like a specific safety concern or escape risk. *Green*, 414 F. Supp. 3d at 916 (citing *Deck v. Missouri*, 544 U.S. 622, 626 (2005)).

The court then reviewed the evidence related to Green's shackling claims that was presented during Green's state *habeas* proceedings. *Id.* at 915–16. Before the Texas *habeas* court, several of Green's trial counsel testified that, although Green was shackled during the trial, it would have been impossible for the jury to see the shackles because only Green's legs had been restrained, Green never entered or exited the courtroom while the jury was present, and Green sat behind a solid wooden table with a backing that extended to the floor and obscured his lower half at all times that the jury was in the courtroom. *Id.* at 915. The bailiff for Green's trial likewise testified that the jury had been unable to view Green's leg restraints during the proceedings due to the location and structure of the table at which he sat. *Id.* Conversely, Green introduced the testimony of two jurors who stated they had been aware that Green was shackled during the trial. *Id.* at 916. One juror testified that he had seen Green in leg restraints several times during both the guilt/innocence and punishment phases, while the other juror stated that he had not actually seen Green's shackles during the trial but had noticed that Green was not moving naturally and assumed that he was restrained. *Id.* The state *habeas* court found that the jurors' testimony was not credible, concluded that no juror saw Green's shackles, and issued a recommendation that Green's shackling claims be denied, which the TCCA then adopted. *Id.*

The district court stated that AEDPA generally does not allow federal courts to second-guess a state court's credibility determinations. *Id.* In light of the contrary testimony from Green's trial counsel and the bailiff, the court continued, it was not unreasonable for the state court to discredit the jurors' claims that they were aware of Green's shackles during trial, the district court continued, and the state court's denial of Green's shackling claims thus

neither rested on an unreasonable reading of the evidence nor conflicted with clearly established federal law. *Id.*

The district court was correct that AEDPA generally requires us to defer to a state court's factual findings, including its credibility determinations. *See Miller-El*, 537 U.S. at 340–41; 28 U.S.C. § 2254(e)(1). "[D]eterminations of demeanor and credibility . . . are peculiarly within a trial judge's province" on even direct review, *Wainwright v. Witt*, 469 U.S. 412, 428 (1985), and when this axiom stands in conjunction with the additional deference that AEDPA mandates, it sets a very high bar for defeating a state court's in-person credibility determinations based only on a paper record. We may only depart from the state court's credibility findings when there is "clear and convincing evidence" in the record rebutting the presumption that they are correct. 28 U.S.C. § 2254(e)(1).

In this case, the conflicting evidence stood nearly in equipoise with respect to whether the jurors saw Green's shackles, with two witnesses testifying that jurors were aware of the shackles and several others testifying that that would not have been possible. Resolving this sort of factual conflict is the duty of the state *habeas* court, who is able to evaluate the demeanor of the various witnesses, *see Wainwright*, 469 U.S. at 428, and the district court was correct that the evidence was not so contrary to the state court's findings that we may overturn them. Because we must accept that jurors never saw Green in shackles, his claims related to his shackling must necessarily fail, and reasonable jurists would not debate this conclusion.

Last, the district court evaluated Green's remaining ineffective assistance of trial counsel claims, which were based on trial counsel's failure to present evidence of Green's diminished capacity due to mental illness and abandonment rage during the guilt/innocence phase or additional mitigation evidence related to Green's mental illness during the punishment phase.

*Green*, 414 F. Supp. 3d at 917–26. The district court noted the clearly established *Strickland* standard for ineffective assistance claims described above, requiring both a showing of error by trial counsel and a demonstration of prejudice. *Id.* at 919–20 (citing *Strickland*, 466 U.S. at 687–91). There is a strong presumption that trial counsel's performance fell within the wide range of reasonable professional assistance, the court continued, and this presumption combines with AEDPA's standard of review to make federal review of ineffective assistance claims that were adjudicated on the merits and denied in state court "doubly deferential." *Id.* at 920.

The district court found that Green had presented "more expansive versions of these same ineffective assistance complaints" in his state *habeas* petition.[6] *Id.* at 918. There, both the clinical psychologist who served as the defense team's mitigation specialist and Green's counsel testified that they made a strategic choice not to present evidence of Green's mental illness during the guilt/innocence phase of the trial. *Id.* The letter Green had written detailing his reasons and plan for killing Lovetta and her children was fully coherent, they noted, and it demonstrated that Green was not insane or experiencing the kind of psychotic break from reality that might have caused him to take Lovetta's and Montgomery's lives without acting knowingly and intentionally. *Id.*

Green does not seriously contest this finding; in his brief in support of his COA motion, Green concedes that "when he committed the crime by killing Lovetta and Jazzmen[,] he [did not] believe[] he was killing someone else or aliens." He instead argues that "[m]itigation is what this issue is about" and states "[t]he issue is whether the mens rea of the crime was

---

[6] Green disputes this determination. But, as stated, if he is correct that his current ineffective assistance claims differ from those presented to the state *habeas* court, the claims are barred by § 2254(b). *See supra* note 5.

sufficiently negated to warrant a sentence of life rather than death." But this wrongly conflates a showing of mitigating circumstances with negating the *mens rea* element of capital murder.

In Texas, capital murder trials proceed in two stages—the first determining whether the defendant is guilty, the second deciding whether, based on the defendant's likelihood of future dangerousness and the presence or absence of mitigating circumstances, the defendant will be sentenced to death or life imprisonment. *See* TEX. CODE CRIM. PROC. art. 37.071. As the district court noted, the state courts in Green's case determined both on direct appeal and in his *habeas* proceeding that there is no diminished capacity affirmative defense to capital murder in Texas other than insanity. *Green*, 414 F. Supp. 3d at 920–21 & n.49. Thus, during the guilt/innocence phase of the trial, evidence of a mental illness that falls short of insanity can at best negate the *mens rea* element of the offense—*i.e.*, show that a defendant did not act knowingly or intentionally because, for example, he was under a delusion or hallucination at the time of the alleged crime.[7] *Id.*

Negating the *mens rea* element is a different concept from mitigation evidence—that is, "evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty" and "that a juror might regard as reducing the defendant's moral blameworthiness," TEX. CODE CRIM. PROC. art.

---

[7] Under Texas law, an insanity affirmative defense—which requires a showing that mental illness prevented a defendant from knowing that his conduct was wrong—differs from a defense that mental illness prevented a defendant from forming the *mens rea* required to commit the crime. *See Ruffin v. State*, 270 S.W.3d 586, 592 n.15 (Tex. Crim. App. 2008) ("[P]ersons [who are] legally insane are not necessarily lacking mens rea. Even defendants who are most demonstrably legally insane rarely lack the mens rea for the highest charged offense." (quoting Stephen J. Morse, *Undiminished Confusion in Diminished Capacity*, 75 J. CRIM. L. & CRIMINOLOGY 1, 18 (1984))).

37.07(d)(1), (f)(4)—which a capital defendant may introduce in the second, punishment phase of the trial in order to argue against the death penalty. *See Penry v. Johnson*, 532 U.S. 782, 797 (2001) (holding that the Eighth and Fourteenth Amendments require that a jury be permitted to fully consider mitigation evidence when imposing the death penalty and "given a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision" (internal quotes and citations omitted)). By acknowledging that his mental illness was not so severe that he was acting unknowingly and unintentionally when he killed Lovetta and Montgomery, Green concedes that his mental illness did not negate the *mens rea* element of capital murder, a binary inquiry that is relevant only during the guilt/innocence phase of the trial and has no direct bearing on the punishment he received in the second phase of the trial. *See Ruffin*, 270 S.W.3d at 593–94. The district court was thus correct that Green failed to establish either an error by trial counsel or prejudice to his case based on counsel's decision not to present evidence of Green's mental illness or abandonment rage during the guilt/innocence phase of his trial, and reasonable jurists would not debate this conclusion.

As for Green's final ineffective assistance claims based on his trial counsel's failure to introduce additional evidence of Green's background, mental illness, and abandonment rage during the punishment phase of his trial, the district court observed that the state *habeas* courts had ruled that the claims satisfied neither prong of *Strickland*. *Green*, 414 F. Supp. 3d at 922–23. Green's "trial counsel presented evidence at [the punishment phase of] trial showing [Green] grew up in a disadvantaged, neglected, abusive environment in which he was exposed to violence, forced to fight, and deprived of the emotional support he needed to be able to deal with his mental and emotional problems." *Id.* at 923. The "defense team presented the testimony of [Green]'s younger brother, mother, maternal grandmother,

aunt, and a pair of mental health experts, who described at great length the difficulties [Green] experienced growing up in a disadvantaged family, with many relatives who displayed signs of mental illness and a physically abusive biological father and a neglectful mother." *Id.* at 925. The defense's "mental health experts [also] furnished testimony regarding [Green]'s poor academic performance and low intellectual functioning," and one of them "furnished a diagnosis of Schizoaffective Disorder of the Bipolar Type, which he described as a severe form of mental illness negatively affecting Petitioner's cognitive abilities and interpersonal relationships." *Id.*

The district court characterized Green's current claims as "arguing in conclusory fashion that his trial counsel could have done a better and more convincing[] job presenting the mitigating evidence the defense actually presented at trial, and should have further investigated and presented additional available mitigating evidence." *Id.* at 922. But the state *habeas* courts concluded that the additional mitigating evidence that Green argues should have been introduced "was largely duplicative of the mitigating evidence [Green]'s trial counsel presented at trial."[8] *Id.* at 924. Further, the state courts determined that, based on their testimony during the state *habeas* proceedings, Green's trial counsel made reasonable strategic decisions to present the evidence in the manner they did, including by introducing it through the testimony of Green's family members and defense clinical mental health experts rather than a forensic social historian as Green now argues they should have. *Id.*

---

[8] As the district court noted, the additional evidence Green argues his counsel should have introduced included affidavits and testimony from his family members, friends, and a forensic mental health expert that were "replete with double-edged evidence" about Green's past violent behavior "that was just as likely to harm [Green] on the future dangerousness special issue as to potentially help him on the mitigation special issue." *See Green*, 414 F. Supp. 3d at 924–26.

No. 19-70019

The district court found that these conclusions were reasonable. The court also determined that, unlike in the Supreme Court cases on which Green relies, Green's trial counsel performed an extensive investigation into Green's background and presented a substantial case in mitigation. *Id.* (citing *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009); *Wiggins*, 539 U.S. at 524–26; and *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000)). The district court was correct that the additional testimony Green argues his counsel should have presented added little, if anything, to the comprehensive mitigation evidence Green's trial counsel presented and potentially opened the door to devastating cross-examination about Green's character and past misconduct. Thus, Green fails to establish either an error or prejudice from trial counsel's decision not to present the mitigation evidence in the way Green contends they should have, nor from counsel's failure to present the additional evidence Green identifies. Reasonable jurists would not debate this conclusion, and it therefore does not warrant a COA. *See Miller-El*, 537 U.S. at 336.

* * *

Based on the foregoing, we AFFIRM the district court's denial of funding and DENY Green's motion for a COA.

24